PANUCO OIL LEASES, INC.

v.

CONROE DRILLING COMPANY et al.

Civ. A. No. 1626.

United States District Court
S. D. Texas,
Corpus Christi Division.
Dec. 21, 1961.

Jack D. Emery, Casper, Wyo., R. Richard Roberts, Houston, Tex., resident counsel, for plaintiff Panuco Oil Leases, Inc.

Wood & Boykin (Ralph R. Wood) Corpus Christi, Tex., Neel & Seaman, C. B. Neel, Corpus Christi, Tex., for defendant Conroe Drilling Company.

Hutcheson, Taliaferro & Hutcheson, Thad Grundy, Houston, Tex., for defendant Commonwealth Oil Company.

Thompson, Knight, Wright & Simmons, Dallas, Tex. (Morris Harrell); Dallas, Tex.,

Wood & Boykin (F. M. Boykin, III), Corpus Christi, Tex., resident counsel, for defendant D. D. Feldman, d/b/a Feldman Oil & Gas.

FISHER, District Judge.

This cause came on regularly for trial on its merits before this Court, at which time came Plaintiff and Defendants, by their respective attorneys of record, and a jury being waived, all issues in the case both of fact and law were submitted to the Court for adjudication; and the Court, after having heard and duly considered the pleadings, evidence and argument of the attorneys, and the briefs filed by the respective parties, makes the following Findings of Fact and Conclusions of Law:

I.

### FINDINGS OF FACT

In the interest of brevity plaintiff, Panuco Oil Leases, Inc., will herein be referred to as "Plaintiff" or "Panuco", defendant Conroe Drilling Company as "Defendant Conroe" or "Conroe", defendant D. D. Feldman, d/b/a Feldman Oil and Gas as "Defendant Feldman" or "Feldman", and defendant Commonwealth Oil Company as "Commonwealth".

1. The Marine Gathering Company was a wholly owned subsidiary of defendant Commonwealth Oil Company until on or about March 1, 1957, when Commonwealth acquired all of its assets by assignment and assumed all of its liabilities; the Marine Gathering Company will be referred to herein as "Marine".

2. By written contract, identified in the record as the "Farm-Out Agreement", dated June 1, 1956, by and between Plaintiff, Panuco, as "Owner" and Defendant Conroe as "Operator", Plaintiff, Panuco, agreed that if Defendant Conroe would, at its sole cost, risk and expense, begin the drilling of a test well at the location and within the time specified in such contract and thereafter drill the same in a diligent and workmanlike manner to a depth of 9,500 feet below the surface Panuco would assign to Conroe in their entirety three oil, gas and mineral leases—the Eva Anderson, Glasson and Searle leases—referred to in the contract as the "Drill Site" and covering in all some 229 acres of land in San Patricio County, Texas, the contract stipulating that in such assignment there should be reserved to Panuco an overriding royalty of one-sixteenth of seven-eighths (1/16th of 7/8ths) of all oil, gas and other hydrocarbons produced, saved and marketed from said leases and such contract also stipulating that such leases should be assigned subject to a one-thirty-second of seven-eighths (1/32nd of 7/8ths) overriding royalty interest reserved by one T. H. Spencer in an assignment of said leases to Panuco. The provisions of said Farm-Out Agreement which are most material to a determination of the

questions raised in this case are as follows:

## "I

"That on or before August 1, 1956, Operator shall commence the actual rotary drilling of a test well to be located * * * on the Eva Anderson Lease * * * which said well shall be drilled in a diligent and workmanlike manner at Operator's sole cost and expense to a depth of 9500 feet below the surface of the ground unless oil or gas in commercial quantities, salt, cavity, or impenetrable formation is encountered at a lesser depth.

"That Operator shall complete said well, including necessary tankage if a producer, or abandonment if a dry hole, within ninety (90) days from the date of commencement of such drilling, subject to Operator not encountering salt, cavity or impenetrable formation."

\* \* \* \* \* \*

## "II

"Upon completion of the well herein required to be drilled, Operator, shall be entitled to an assignment of all the acreage contained in the drill site, which assignment shall reserve to Owner a ⅓₆th of ⅞ths overriding royalty of all oil, gas and other hydrocarbons produced, saved, and marketed."

\* \* \* \* \* \*

## "VII

"After the completion of the well herein required to be drilled, should Operator desire to sell all or any part of its leasehold estates covered by this agreement, it will notify Owner as hereinabove provided of any bona fide offer that it has to sell such interest giving to Owner the interest it proposes to sell and the amount to be received for the interest to be sold and thereafter Owner shall have five (5) days in which to purchase the interest that Operator desires to sell at the price set forth in the notice given by Operator to Owner, and upon Owner's failure to immediately notify Operator after the expiration of five (5) days of its election to purchase said interest at the price proposed, then Operator shall be free to sell such interest. Nothing herein shall prevent Operator from selling any interest in the leasehold estate that it may see fit to do prior to the completion of the first well to anyone it sees fit to sell and at the price and terms it sees fit to sell, even though said assignment of such interest would not be executed and delivered prior to the completion of such first well.

## "VIII

"Operator is expressly given the right to assign an interest in the leasehold estate to D. D. Feldman, d/b/a 'D. D. Feldman Oil and Gas of Dallas, Texas', and a production payment to B. M. Easley and Roman S. Waldron. \* \* \* "

3. The Farm-Out Agreement contained no provision giving Panuco the right or option to take the well over and drill it deeper after it had been drilled to the contract depth by Conroe; nor did such agreement in any manner restrict or limit the right of Defendant Conroe and its assigns to drill the well deeper.

4. By letter-form agreement dated June 13, 1956, between Defendant Conroe and Defendant Feldman, Conroe agreed, for a consideration of $62,500 in cash, to assign to Feldman a three-fourths (¾ths) undivided interest in four leases, including said Eva Anderson, Glasson and Searle leases covered by the Farm-Out Agreement, and to drill the test well as required in said Farm-Out Agreement. Such letter-form agreement further provided that if such well when drilled to the required depth should be "dry" or non-productive then Feldman should receive the proceeds of dry-hole contribution letters of Tidewater Oil Company and Houston Natural Gas Company in the amount of $19,000. By letter-form

agreement dated July 21, 1956, between Feldman and Marine, Feldman agreed, for a consideration of $22,000 in cash, to assign to Marine a one-third (⅓rd) interest of all rights, titles and interests Feldman was entitled to receive from Conroe, or a one-fourth (¼th) interest in the four leases covered by the letter-form agreement between Conroe and Feldman, including the three leases to which the Farm-Out Agreement related.

5. Prior to the date required Conroe began drilling and on or about August 3, 1956, had drilled the Eva Anderson No. 1 Well (the test well) to a depth of 9,512 feet, which was in excess of the contract depth, without encountering any productive formation. In the course of the drilling of the well to such depth Conroe furnished Panuco with all such reports and information as were required by, and in all respects fully performed, its contract with Panuco. Accordingly, when the well had been drilled to such depth Conroe had earned its assignments of the leases from Panuco, and at the same time and by virtue of Conroe's performance Feldman became entitled to an assignment from Conroe of an undivided three-fourths (¾ths) interest in the leases and Marine to an undivided one-fourth (¼th) interest therein by assignment from Feldman. In other words, at that time Conroe was vested with the equitable title to a one-fourth (¼th) interest, Feldman to a one-half (½) interest, and Marine to an undivided one-fourth (¼th) interest in the three leases covered by the Farm-Out Agreement.

6. When the well had been drilled to 9,512 feet Conroe chose not to dig the well deeper and so advised Panuco that they, Panuco, might "take over." Panuco did not wish to take over the well and neither did they wish to send a representative to be present at the time of the running of an electric log on the well.

7. Marine expressed a desire to drill the well deeper. On or about August 3, 1956, when the well had been drilled to a depth of 9,512 feet, a representative of Marine proposed to the President of Conroe Drilling Company, that if Conroe would agree to assign its one-fourth (¼th) interest to Marine, reserving a small production payment interest, and if Marine could acquire additional working interest from Feldman, and if Marine could obtain additional dry-hole contribution from Tidewater Oil Company and Houston Natural Gas Company, Marine would recommend deepening the well from 9,512 feet to 10,500 feet. Conroe at that time in response, orally agreed that if Marine would deepen the well from 9,512 feet to 10,500 feet, Conroe would exchange its one-fourth (¼th) working interest for a small production payment interest. In this connection, it took a few days to complete negotiations with Feldman, Houston Natural Gas Company and Tidewater Oil Company and to obtain a larger rig required for the deepening operations. A temporary cement plug was set, so as not to interfere with the deepening operations, but would protect the well from possible blowout during the few days required for negotiations and for the moving off location of Conroe's small rig and moving on location a larger rig to take the well deeper. The cement plug was set in the well at the depth of about 1200 to 1400 feet, which was approximately 100 feet above the bottom of the surface casing.

8. A few days after having made the agreement with Defendant Conroe, Defendant Marine made an agreement with Defendant Feldman under the terms of which in consideration of Marine deepening the well from 9,512 feet to 10,500 feet Feldman agreed to assign to Marine two-thirds (⅔rds) of the three-fourths (¾ths) interest in the well and leases which he was to acquire from Conroe, or an additional one-fourth (¼th) of the total working interest to the one-fourth (¼th) he had agreed to assign to Marine under the letter-agreement of July 21, 1956. It was further agreed that if the well was completed as a producer of oil or gas or both in commercial quantities Feldman would assign his remaining one-fourth (¼th) to Marine until a $19,000

production payment to Houston Natural Gas Company and Tidewater Oil Company to be discharged, (representing the repayment of the $19,000 dry-hole contribution of Houston Natural Gas Company and Tidewater Oil Company which had been collected when the well had been drilled to 9,500 feet), and until Marine had received from the proceeds of production therefrom an amount equal to 200% of Feldman's share of the costs incurred in completing and equipping the well plus the cost of operation, in the event Feldman elected not to pay in cash his one-fourth (¼th) of such completion and equipment costs. The oral agreement between Defendant Conroe and Marine with respect to deepening the well was thereafter reduced to letter-form written agreement dated August 10, 1956; and the oral agreement between Defendant Feldman and Marine with respect to deepening the well was reduced to writing by letter-form agreement dated August 13, 1956, which amended and modified their previous letter-form agreement dated July 21, 1956.

9. The Eva Anderson No. 1 Well here in question was neither "completed" nor "Abandoned" within the meaning of the Farm-Out Agreement when the well had been drilled to the depth of 9,512 feet on or about August 3, 1956, and was temporarily plugged in the manner above described on August 4, 1956; nor had it been so completed or abandoned on August 10, 1956, the date of the written agreement between Defendant Conroe and Marine, or on August 13, 1956, the date of the written agreement between Defendant Feldman and Marine with respect to deepening the well. Although Defendant Conroe furnished Plaintiff, Panuco, its daily report dated August 6, 1956, and received by Panuco on August 7, 1956, reciting that the well had been "plugged and abandoned 9,512′, 8–4–56" and with copy of Plugging Record, Form 4, furnished to the Texas Railroad Commission showing that the well had been "plugged" on August 4, 1956, Plaintiff, Panuco, did not rely upon them to its detriment. The aforementioned Plugging Record was not received by the Railroad Commission until August 15, 1956, which was two days after the receipt by the Commission of the application of Marine to deepen said well.

10. Shortly after such well had been temporarily plugged in the manner hereinbefore described on August 4, 1956, Conroe moved its drilling rig off the location and within a few days thereafter Marine caused a larger rig of an independent contractor to be moved on the well to drill it deeper even before the written agreements just referred to were signed. Thereafter, Marine caused such well to be drilled to a depth of 10,510 feet and on September 12, 1956, completed the well as a producer of gas in paying and commercial quantities at a depth of 9,934 feet. The total cost of deepening and completing the well was $112,306.85.

11. By assignments dated August 28, 1956, Plaintiff, Panuco, voluntarily assigned all its interest in the three leases described in the Farm-Out Agreement to Defendant Conroe. It did so in recognition of the performance by Conroe of its obligations under the Farm-Out Agreement and in order that Panuco might be relieved from any further obligation to pay delay rentals. Such assignments contained no reference to the Farm-Out Agreement nor to the option or right of refusal in the event of sale set forth in paragraph VII thereof. No such option or right was reserved in the assignments which were usual, simple, unconditional assignments of the leases subject only to the one-thirty-second of seven-eighths (1/32nd) of 7/8ths) overriding royalty interest which had been theretofore reserved by one T. H. Spencer and to an additional one-sixteenth of seven-eighths (1/16th of 7/8ths) overriding royalty reserved by Plaintiff, Panuco.

12. Pursuant to its letter-form agreement dated June 13, 1956, by instrument dated October 11, 1956, Conroe assigned an undivided three-fourths (¾ths) interest in said three leases to Feldman subject to its proportionate part of the

Panuco and Spencer overriding royalty interests. Such assignment contained no reference to the Farm-Out Agreement nor to the option or right of refusal clause contained in the Farm-Out Agreement.

12. Pursuant to his letter-form agreement dated July 21, 1956, as amended and modified by the letter-form agreement dated August 13, 1956, by instrument dated October 11, 1956, Feldman assigned all of his interest in said three leases to Marine with a provision that a one-fourth (¼th) interest in such leases should revert to and revest in Feldman on recovery by Marine from production of two hundred per cent (200%) of Feldman's share of the cost of completing and equipping the Eva Anderson No. 1 Well, the cost of operation thereof and the discharge of a $19,000 production payment held by Houston Natural Gas Company and Tidewater Oil Company; such assignment was also subject to its proportionate part of the Panuco and Spencer overriding royalties. Such assignment contained no reference to the Farm-Out Agreement nor to the option or right of refusal clause contained in the Farm-Out Agreement.

13. Pursuant to its letter-form agreement dated August 10, 1956, by instrument dated November 2, 1956, Conroe assigned to Marine its remaining one-fourth (¼th) interest in said three leases subject to its proportionate part of the Spencer and Panuco overriding royalties, a production payment of 3.171875 per cent of production assigned to B. M. Easley, and a production payment of 1.5850375 per cent total production assigned to Roman S. Waldron, and reserved to itself a production payment interest of 1.585937 per cent of total production. Such assignment contained no reference to the Farm-Out Agreement nor to the option or right of refusal clause contained in the Farm-Out Agreement.

14. Commonwealth conducted workover operations on the Eva Anderson No. 1 Well in January, 1957, at a cost of $9,890.35.

15. In March, 1957, Carlton, president of Panuco, and Emery, its attorney, visited the offices of Commonwealth in Houston, Texas, where they requested and were given full and complete information regarding the deepening, completion and operation of said well, including copies of all pertinent documents.

16. By letter dated April 4, 1957, an offer was made to sell Panuco to Commonwealth, stating that as of September 30, 1956, Panuco had a capital deficit of $2,129,599.00, a tax loss carryover of $2,222,766.99, and cash on deposit of $10,559.00.

17. Panuco filed its original complaint in this action against Conroe and Feldman on August 8, 1957, seeking only to recover damages for alleged breaches of the Farm-Out Agreement.

18. Commonwealth conducted further workover operations on the Eva Anderson No. 1 Well in December, 1957, at a further cost of $25,869.69.

19. At some time early in 1958, Carlton, president of Panuco, suggested to an employee of Houston Natural Gas Company in Corpus Christi and to an officer of said company in Houston the possibility of a sale by Panuco to that company of an interest in the Eva Anderson No. 1 Well, which was the interest that Panuco expected to try to recover from Commonwealth and which Panuco did not then own.

20. The Eva Anderson No. 2 Well was commenced on March 21, 1958, and completed later in the same year, at a total cost of $154,352.62.

21. Panuco executed and delivered to Commonwealth, on or about April 2, 1958, a gas division order, effective as of the first gas sales, ratifying and confirming the division of interests in the said Eva Anderson No. 1 Well and No. 2 Well between all of the owners thereof and which set forth the interest of Panuco as being only one-sixteenth of seven-eighths (¹⁄₁₆th of ⅞ths) overriding royalty interest reserved by Panuco in the original Farm-Out Agreement.

22. During the month of May, 1958, Panuco took the oral depositions of Calvert and of H. M. Temple, secretary of Commonwealth, and, on September 22, 1958, filed its first amended complaint, bringing Commonwealth into this action as a defendant.

23. Based upon the division of interest set out in said division order, Commonwealth paid to Panuco, at regular intervals up to September 18, 1958, the total sum of $2,897.58, representing the value of that portion of the production of gas from the leases covered by said division order to which Panuco was entitled thereunder.

24. Panuco did not at any time prior to the filing of the first amended complaint complain to Marine or to Commonwealth about the deepening and completion of the Eva Anderson No. 1 Well, or about the drilling and completion of the Eva Anderson No. 2 Well, or advise Commonwealth of its intention to file suit against it, or notify Commonwealth of its claim that Commonwealth was not drilling the said Eva Anderson Well No. 2 in good faith.

25. Panuco did not at any time tender to Commonwealth an agreement to drill the Eva Anderson No. 2 Well, nor did Panuco at any time tender to Commonwealth the cost of drilling and completing said well, or any part thereof; and Panuco was never at any time ready, willing or able to drill and complete the Eva Anderson No. 2 Well.

## II

## CONCLUSIONS OF LAW

1. No facts were proven or circumstances presented by Plaintiff in this case which would put the option or right of refusal clause as set forth in paragraph VII of the Farm-Out Agreement into effect.

2. The Eva Anderson No. 1 Well, the well in question, had not, as a matter of law been completed in August, 1956, when there was a temporary stoppage in the drilling operations and a temporary plug set while negotiations between the parties were conducted, the small rig of Conroe moved off the well and a large rig moved on the well to drill it deeper; nor was there an abandonment of the well during that interim period. The well, as a matter of law, was not completed until production in paying quantities was encountered and the well completed and equipped on September 12, 1956.

3. The letter-form agreements between Conroe and Marine and Feldman and Marine, dated, respectively, August 10 and August 13, 1956, providing for the exchange of interests in consideration of Marine's agreement to drill the well deeper were not "sales" within the contemplation of the option or right of refusal clause, paragraph VII of the Farm-Out Agreement.

4. Accordingly, even if the agreements between Conroe and Marine and Feldman and Marine, dated, respectively, August 10, and August 13, 1956, be considered "sales" within the meaning of that term as used in the option or right of refusal clause of the Farm-Out Agreement, they were not in violation of such clause because they were made before such well was completed and were expressly authorized under the terms of such clause.

5. At the time the agreements were made between Conroe and Marine and Feldman and Marine, Plaintiff, Panuco, neither as an overriding royalty interest owner nor as a party to the Farm-Out Agreement, had any right to take the well over and deepen it; and, the Defendant Conroe having fully complied with its contract, it was of no concern of Plaintiff that the Defendants, as the leasehold owners, accomplished the deepening of the well by entering the agreements of August 10 and 13, 1956.

6. If Plaintiff, Panuco, had any option or right of refusal to acquire from the Defendants Conroe and Feldman the interests they respectively agreed to assign to Marine, such right was merged

into and extinguished by the execution and delivery of the three unqualified and unconditional assignments in which no such option or right of refusal was reserved. In the absence of express language in such assignments to the contrary, all preliminary agreements, such as the Farm-Out Agreement, were merged into and extinguished by such assignments.

7. Plaintiff, by its actions and conduct, waived the right, if any it ever had, to take the well over and deepen it or to object to the defendants, or any of them, doing so.

8. By reason of the language of Paragraph VIII of the Farm-Out Agreement, the interests of Defendant Feldman in the leases involved in this suit were not covered, affected by, nor subject to the option or right of refusal claimed by Plaintiff.

9. Panuco never acquired any right to seek specific performance by Commonwealth of the option or right of refusal clause set forth in paragraph VII of the Farm-Out Agreement.

10. Because of its long delay in asserting a claim against either Marine or Commonwealth, and accepted payments of royalty from Commonwealth, Panuco's alleged claim of right to specific performance is wholly without equity.

11. Panuco is not entitled to specific performance by Commonwealth of the option or right of refusal clause set forth in paragraph VII of the Farm-Out Agreement.

12. Panuco is estopped by its conduct to assert any claim against Commonwealth.

Based on the above Findings of Fact and Conclusions of Law, the Court finds in favor of the Defendants and against the Plaintiff and Judgment is this day entered that Plaintiff take nothing as against Defendants, and is denied all relief prayed for.